## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF ORTHOGEN
INTERNATIONAL GMBH,

                Petitioner,

for an order pursuant to 28 U.S.C. § 1782 to
conduct discovery for use in a foreign
proceeding.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:

Case No.

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING

BILZIN SUMBERG BAENA
PRICE & AXELROD LLP
Ilana Drescher (Fla. Bar No.: 1009124)
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone: 305-374-7580

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
Christopher B. Harwood (*pro hac vice* forthcoming)
Joseph Stern (*pro hac vice* forthcoming)
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600

*Attorneys for Petitioner Orthogen*
*International GmbH*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

    A.    Mr. Capla Apparently Underreported Regenokine Treatments to Orthogen........... 4

    B.    As a Result of the Apparently False Reports and Affidavits, Orthogen Appears to Have Been Defrauded Out of Many Millions of Dollars ..................... 6

    C.    Evidence From the SDNY Action Strongly Supports the Conclusion that Orthogen was Underpaid by Many Millions of Dollars .......................................... 7

          i.    NY Spine's Apparent Servicing of 3,500 Patients..................................... 8

          ii.    Mr. Capla and Dr. Schottenstein's Alleged Receipt of $12 Million Per Year ..................................................................................................... 9

    D.    Orthogen Sent Demand Letters to Mr. Capla and Dr. Schottenstein...................... 9

    E.    Orthogen Seeks Discovery for the Contemplated German Proceeding................. 10

ARGUMENT ......................................................................................................................... 13

    I.    THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782...................................................................................................... 13

          A.    Orthogen is an "Interested Person" for Purposes of the Foreign Proceeding......................................................................................... 14

          B.    The Petition Seeks Documentary and Testimonial Evidence ................... 14

          C.    The Discovery Sought Is for Use in a Proceeding Before a Foreign Tribunal....................................................................................... 14

          D.    The Caplas Reside and/or are Found in this District ................................ 16

    II.    THE FOUR DISCRETIONARY FACTORS ALL WEIGH IN FAVOR OF GRANTING THE REQUESTED DISCOVERY.................................................. 16

          A.    Orthogen Needs Section 1782 Discovery From the Caplas ..................... 17

          B.    A German Court Likely Would Be Receptive to the Requested Discovery ................................................................................................... 18

          C.    Petitioner Is Not Seeking to Circumvent German Proof-Gathering Restrictions .............................................................................................. 19

i

D.      Orthogen's Discovery Requests Are Narrowly Tailored and Not
        Unduly Intrusive or Burdensome ............................................................. 20

CONCLUSION ......................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
  292 F.3d 664 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004) .............................................. 17

*Application of Consorcio v. JAS Forwarding (USA), Inc.*,
  747 F.3d 1262 (11th Cir. 2014) .............................................................................................. 14

*Application of Furstenberg Fin. SAS v. Litai Assets LLC*,
  877 F.3d 1031 (11th Cir. 2017) .............................................................................................. 13

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995)..................................................................................................... 19

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)..................................................................................................................... 16

*In re Accent Delight*,
  869 F.3d 121 (2d Cir. 2017)...................................................................................................... 15

*In re Alianza S.A.*,
  2013 WL 6225179 (S.D. Fla. Oct. 24, 2013).................................................................... 14

*In re Application of Auto-Guadeloupe*,
  2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ............................................................. 17, 18

*In re Application of Bracha.*,
  663 F. App'x 755 (11th Cir. 2016)................................................................................... 14, 15

*In re Application of Hill*,
  No. M19-117(RJH), 05CV999996, 2007 WL 1226141 .................................................. 19

*In re Application of Inversiones*,
  2011 WL 181311 (S.D. Fla. Jan. 19, 2011) ...................................................................... 16

*In re Application of Patokh*,
  2021 WL 3270042 (S.D.N.Y. July 30, 2021) .................................................................. 18

*In re Application of Roessner*,
  2021 WL 5042861 (S.D.N.Y. Oct. 29, 2021) ................................................................... 19

*In re Barnwell Enterprises Ltd*,
  265 F. Supp. 3d 1 (D.D.C. 2017) ......................................................................................... 20

*In re Bernal*,
    2018 WL 6620085 (S.D. Fla. Dec. 18, 2018) .................................................................... 19

*In re Clerici*,
    481 F.3d 1324 (11th Cir. 2007) ............................................................................... passim

*In re del Valle Ruiz*,
    939 F.3d 520 (2d Cir. 2019)..................................................................................... 16

*In re Deposito Centralizado*,
    2021 WL 2323226 (S.D. Fla. June 1, 2021) ................................................................ 19

*In re Emergency Ex Parte Application of Godfrey*,
    2018 WL 1863749 (S.D. Fla. Feb. 22, 2018) ................................................... 17, 18, 20

*In re England/Bahamas*,
    2021 WL 3270074 (S.D. Fla. July 30, 2021)........................................................... 18, 19

*In re Ex Parte Application of Porsche*,
    2016 WL 702327 (S.D.N.Y. Feb. 18, 2016)............................................................. 1, 18

*In re Gonzalez*,
    2021 WL 3835180 (S.D. Fla. Apr. 14, 2021) ................................................................ 15

*In re Hansainvest*,
    364 F. Supp. 3d 243 (S.D.N.Y. 2018)................................................................ 15, 18, 19

*In re Pons*,
    2020 WL 364125 (S.D. Fla. Jan. 22, 2020) ................................................................ 15

*In re Servicio*,
    354 F. Supp. 2d 269 (S.D.N.Y. 2004)........................................................................ 18

*In re Vedam*,
    2022 WL 18717048 (M.D. Fla. Nov. 3, 2022) ................................................................ 1

*In re Veiga*,
    746 F. Supp. 2d 8 (D.D.C. 2010) ................................................................................ 15

*In re WinNet*,
    2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017)................................................................ 17

*Kang v. Nova Vision, Inc.*,
    2007 WL 1879158 (S.D. Fla. June 26, 2007) ................................................................ 19

*Schottenstein et al. v. Capla et al.*,
    No. 22-10883-PKC (S.D.N.Y.)......................................................................................... 6

**Statutes**

28 U.S.C. § 1782...................................................................................................... 1, 14, 16

Orthogen International GmbH ("Orthogen" or "Petitioner") submits this memorandum of law, along with the declarations of Dr. Stefan Kruger ("Kruger Decl.") and Christopher B. Harwood ("Harwood Decl."), in support of its *ex parte* application for an order, under 28 U.S.C. § 1782 ("Section 1782"), to conduct discovery for use in a foreign proceeding (the "Petition").[1]

## PRELIMINARY STATEMENT

Orthogen, a German biotech company that licenses its propriety medical treatments to physicians around the world, seeks discovery pursuant to Section 1782 for use in a civil proceeding that Orthogen plans to file in Germany based on the underpayment of royalties it was due from two of its licensees, Mr. Edward Capla and Dr. Douglas Schottenstein ("Contemplated German Proceeding"). Specifically, pursuant to several license agreements that Orthogen entered with Mr. Capla and Dr. Schottenstein, Mr. Capla and Dr. Schottenstein were permitted to treat patients with Orthogen's patented Regenokine Program in exchange for their agreement to make royalty payments to Orthogen.

During Orthogen's multi-year relationship with Mr. Capla and Dr. Schottenstein, it received regular reports from Mr. Capla identifying, among other things, (i) the number of Regenokine Program treatments that were administered to patients through Dr. Schottenstein's practice, Schottenstein Pain and Neuro, PLLC d/b/a NY Spine ("NY Spine"), and (ii) the dollar amount invoiced pursuant to such treatments — together with affidavits attesting to the accuracy of the reports. In accordance with the terms of the license agreements, Mr. Capla was required to

---

[1] Section 1782 applications routinely are granted on an *ex parte* basis. *See, e.g.*, *In re Vedam*, 2022 WL 18717048, at *2 (M.D. Fla. Nov. 3, 2022) ("It is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.") (citing *In re Clerici*, 481 F.3d 1324, 1331 (11th Cir. 2007). Any issues concerning the propriety of the discovery sought, including whether it meets the requirements of Section 1782, can be addressed in a motion to quash, or in response to a motion to compel. *See, e.g.*, *id.* ("[R]espondent . . . can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."); *In re Ex Parte Application of Porsche*, 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016) (same). Accordingly, no prejudice will result if Petitioner's Section 1782 application is granted *ex parte*.

report such information to Orthogen, and Orthogen was to use, and did use, the figures reported by Mr. Capla to invoice Mr. Capla and Dr. Schottenstein for the use of its Regenokine Program. Based on the reports from Mr. Capla, Orthogen invoiced and was paid a total of $6.3 million.

Throughout its relationship with Mr. Capla and Dr. Schottenstein, Orthogen believed that Mr. Capla's reports were accurate, and that it therefore was invoicing and being paid the amounts it was due under the license agreements. Recently, however, Orthogen has obtained evidence reflecting that it was systematically defrauded through the underreporting of patient treatments and the withholding of millions of dollars in royalty payments to which it was due.

Orthogen learned of the fraud when, in connection with a lawsuit that Dr. Schottenstein recently filed against it and Mr. Capla (among others) in the U.S. District Court for the Southern District of New York ("SDNY Action") arising out of the termination of Dr. Schottenstein's license agreement with Orthogen, Dr. Schottenstein made sworn statements indicating that the number of Rogenokine patient treatments administered by NY Spine was far higher than Mr. Capla had reported. Specifically, in his verified complaint in the SDNY Action, Dr. Schottenstein stated that NY Spine treated thousands more patients than was reported to Orthogen and that he and Mr. Capla received millions of dollars more than would have been appropriate if the number of patient treatments reported to Orthogen was accurate.

Based on Dr. Schottenstein's statements in the SDNY Action, for years Mr. Capla apparently (i) prepared false reports that vastly understated both the number of Regenokine patient treatments provided by NY Spine and the dollar amounts invoiced in connection with such treatments, and (ii) falsely attested to the reports' accuracy. Moreover, although Dr. Schottenstein did not prepare the reports, good reason exists to believe that Dr. Schottenstein knew about the apparent misconduct. Beginning in 2013, the bank wires that Orthogen received

in response to its invoices came from "Schottenstein Pain and Neuro" — *i.e.,* Dr. Schottenstein's practice.  Dr. Schottenstein presumably (i) knew the amounts that *his practice* was remitting to Orthogen as payment for the royalties due under the license agreements, and (ii) recognized that such amounts could not be squared with the number of patients that *his practice* treated.

    Accordingly, Orthogen intends to initiate a lawsuit against Mr. Capla and Dr. Schottenstein in Germany (an indisputably proper venue for such a lawsuit under the terms of the license agreements), in which it plans to assert claims for breach of contract and fraud.  To further develop the facts for purposes of the Contemplated German Proceeding, Orthogen seeks discovery through this Petition from Mr. Capla and his wife, Yolanda Capla — who worked at NY Spine and transmitted many of the reports prepared by Mr. Capla to Orthogen — that is highly relevant to its anticipated claims.  The discovery seeks information related to the number of Regenokine Program patient treatments provided by NY Spine, the amounts that patients paid for such treatments, the amounts that Mr. Capla and Dr. Schottenstein received in connection with the treatments, and the reports of the treatments that Mr. Capla prepared for Orthogen.[2] This Petition is being filed in this District because Edward and Yolanda Capla (the "Caplas") reside in Boca Raton, Florida.

    For the reasons set forth below, Orthogen respectfully submits that this Section 1782 Petition should be granted.  *First*, the Petition meets the statutory requirements for a Section 1782 petition because: (i) Orthogen would be a party to (and thus an "interested person" in) the foreign proceeding; (ii) the request seeks evidence in the form of documents and testimony; (iii) the discovery sought is "for use" in a "foreign proceeding" that is reasonably contemplated; and (iv) the Caplas "reside" and/or are "found" in this District.

---

[2] Orthogen is filing a similar Section 1782 petition in New York directed at Dr. Schottenstein and his practice.

*Second*, the discretionary factors that courts consider in determining whether to authorize discovery pursuant to Section 1782 all favor granting the Petition.  Specifically, (i) the discovery sought from the Caplas would be unavailable in the Contemplated German Proceeding, which counsels in favor of granting the Petition (as other courts considering Section 1782 applications in connection with German proceedings have found); (ii) no reason exists to believe that a German court would be unreceptive to the requested discovery; (iii) the Section 1782 Petition is not an attempt to circumvent any proof-gathering restrictions of the German courts; and (iv) the requested discovery is not unduly intrusive or burdensome.

## BACKGROUND

### A.    Mr. Capla Apparently Underreported Regenokine Treatments to Orthogen

Orthogen is a privately held, research-based biotech company that has developed various patented medical technologies.  Kruger Decl. ¶ 2.  One such patented technology is the Regenokine Program, a regenerative medicinal therapy used to treat a patient's joint and muscle pain.  *Id.* ¶ 3.  To facilitate Regenokine Program patient treatments in the United States, Orthogen contracted with Mr. Capla and Dr. Schottenstein.  *Id.* ¶ 4.

Orthogen entered into one license agreement with Mr. Capla alone and three agreements with both Mr. Capla and Dr. Schottenstein.  *Id.* ¶ 5.  Specifically, in May 2011, Orthogen entered into an initial license agreement with Mr. Capla alone, whereas in October 2012, September 2013, and June 2014, Orthogen entered into subsequent license agreements with both Mr. Capla and Dr. Schottenstein (each individually, an "Agreement," and collectively, the "Agreements").  *Id.* ¶ 6; *see also id.* ¶ 7 (attaching copies of the agreements).  The Agreements permitted Mr. Capla and Dr. Schottenstein to use the Regenokine Program in exchange for their agreement to make specified royalty payments to Orthogen.  *Id.* ¶ 8.

Under the 2011, 2012, and 2013 Agreements, Orthogen was to be paid 40% of the net

4

fees (*i.e.*, gross fees after the deduction of certain costs and taxes) obtained through the use of the Regenokine Program.  *Id.* ¶ 9.  Under the 2014 Agreement, Orthogen was to be paid a set dollar amount for each treatment provided to a patient using the Regenokine Program.[3]  *Id.* ¶ 10.

Under all four Agreements, Orthogen was to be provided regular reports setting forth, among other things, each Regenokine Program treatment administered to a patient within the reporting period, and the amount of money invoiced for each such treatment.  *Id.* ¶ 11.  The reports were to be accompanied by an affidavit attesting to the accuracy of the information in the reports.[4]  *Id.* ¶ 12.  Both Mr. Capla and Dr. Schottenstein were responsible for providing the reports and affidavits under the 2012 Agreement; under the other Agreements, the responsibility was Mr. Capla's alone.  *Id.* ¶ 13.  In practice, under all four Agreements, Mr. Capla was the one responsible for the reports and affidavits.  *Id.*  Indeed, for all four Agreements, he signed both the reports and the affidavits that were provided to Orthogen.  *Id.*  Yolanda Capla, who worked in the NY Spine laboratory and prepared the laboratory work needed to conduct the Regenokine Program treatments, transmitted many of the reports and affidavits to Orthogen.  *Id.* ¶ 15.  Under the 2012, 2013, and 2014 Agreements, Mr. Capla and Dr. Schottenstein agreed that "[f]or any and all payments that are due under or in connection with th[e] Agreement[s], . . . [they would] be considered joint debtors."  *Id.* ¶ 16.

All four Agreements provide that German law governs any disputes arising under them.  *Id.* ¶ 17.  With respect to forum selection, the 2011 and 2012 Agreements provide that German courts have exclusive jurisdiction over any disputes, but include an exception allowing Orthogen

---

[3] The payment schedule was: (i) $4,000 for any treatment of a joint, muscle, or tendon in a patient (unless the patient already had received treatment of a joint, muscle, or tendon within the prior six months, in which case the cost per treatment was $2,000), and (ii) $5,000 per treatment of the spine in a patient.  Kruger Decl. ¶ 10.

[4] Under the 2011 and 2012 Agreements, the submissions were to be "affidavits," whereas under the 2013 and 2014 Agreements, the submissions were to be "written confirmations."  Kruger Decl. ¶ 12.  Both the affidavits and confirmations are referred to as "affidavits."  Whether the submissions were by "affidavit" or "written confirmation" is immaterial for the purposes of the claims Orthogen plans to advance in the Contemplated German Proceeding.  *Id.*

to initiate litigation in New York.  *Id.*  The 2013 and 2014 Agreements also provide that German

courts have exclusive jurisdiction over any disputes, and do not include any exception.  *Id.*

During the period when all four Agreements were in effect — August 2011 through May

2020 — Mr. Capla executed the required reports and affidavits that were provided to Orthogen,

attesting that a total of 1,325 Regenokine Program patient treatments were administered.  *Id.* ¶

19.  Based on the reports and affidavits, Orthogen invoiced and was paid a total of $6,303,300.

*Id.* ¶ 20.  In December 2022, however, Orthogen obtained information — specifically, sworn

evidence that Dr. Schottenstein submitted in the SDNY Action, *Schottenstein et al. v. Capla et

al.*, No. 22-10883-PKC (S.D.N.Y.) — that led it to conclude that the reports and affidavits

prepared by Mr. Capla were false, in that they substantially underreported (i) the number of

patient treatments that were provided and (ii) the associated fees that were invoiced.  *Id.* ¶ 21.

> **B.    As a Result of the Apparently False Reports and Affidavits, Orthogen
>         Appears to Have Been Defrauded Out of Many Millions of Dollars**

On December 27, 2022, Dr. Schottenstein and his practice, NY Spine, filed the complaint

in the SDNY Action against, among others, Orthogen and the Caplas.  Harwood Decl. ¶ 2.  The

claims against the Orthogen parties are meritless, and indeed, since filing the complaint, Dr.

Schottenstein has not pursued it or even validly served it.  *Id.* ¶¶ 3-4.  The complaint, however

(which was verified under oath by Dr. Schottenstein), as well as an accompanying affidavit

submitted by Dr. Schottenstein, contain statements that revealed to Orthogen that, for years,

Orthogen was defrauded out of millions of dollars.  *See id.* Exs. A & B.

In particular, Dr. Schottenstein's complaint and affidavit attest that: (i) "[t]ens of millions

of dollars of revenue" were paid to Orthogen (*id.* Ex. B ¶ 20); (ii) from 2014 through 2020, the

Regenokine Program "yielded distributions to plaintiffs [*i.e.*, Dr. Schottenstein and NY Spine] of

$6 million per year and a like amount to [Mr.] Capla with distributions to J. Capla, T. Capla and

6

[Mrs.] Capla for their services" (*id.* Ex. A ¶¶ 51, 76); and (iii) after 2014, the number of Regenokine Program patients "grew to in excess of 3,500" (*id.*).

The above statements support that Mr. Capla's reports and affidavits were false, and, as a result, Orthogen was significantly underpaid. Kruger Decl. ¶ 23. *First*, as set forth above, based on Mr. Capla's reports and affidavits, Orthogen billed and was paid a total of $6.3 million pursuant to the Agreements. If, however, "[t]ens of millions of dollars of revenue" should have been paid to Orthogen (as Dr. Schottenstein's affidavit states), then the reports and affidavits significantly underreported the number of the Regenokine Program treatments administered to patients and the fees invoiced for such treatments. *Id.* ¶ 24.

*Second*, Dr. Schottenstein's statement that he and Mr. Capla each received "distributions . . . of $6 million *per year*" cannot be squared with the reports and affidavits that were submitted to Orthogen over a period spanning nearly *nine years* — pursuant to which Orthogen was paid a total of only $6.3 million. Based on how Orthogen was to be compensated, Mr. Capla's and Dr. Schottenstein's stated receipt of $6 million per year means that Orthogen should have received more than $6 million per year. *Id.* ¶ 25.

*Finally*, Dr. Schottenstein's sworn statement that there were "in excess of 3,500" Regenokine *patients* stands in stark contrast to the 1,325 total patient *treatments* reported by Mr. Capla. Again, based on how Orthogen was to be compensated, the servicing of more than 3,500 patients would mean that Orthogen should have received millions of dollars more than it was paid based on Mr. Capla's apparently false reports and affidavits. *Id.* ¶ 26.

### C.    Evidence From the SDNY Action Strongly Supports the Conclusion that Orthogen was Underpaid by Many Millions of Dollars

The analyses set forth below, which are based on the statements by Dr. Schottenstein in the SDNY Action, all have led Orthogen to the same well-supported conclusion:  Mr. Capla's

reports and affidavits (i) were false, (ii) substantially underreported the number of treatments that were provided and the associated fees that were invoiced, and (iii) resulted in Orthogen being substantially underpaid.  *Id.* ¶ 27.

### i.     *NY Spine's Apparent Servicing of 3,500 Patients*

The gap between the "in excess of 3,500" *patients* that Dr. Schottenstein's complaint states that NY Spine treated and the 1,325 total patient *treatments* that Mr. Capla reported to Orthogen evidences a substantial underpayment of royalties to Orthogen.  The underpayment exists whether the amounts owed are analyzed under the percentage approach in the 2011, 2012, and 2013 Agreements or the flat-fee approach in the 2014 Agreement.  *Id.* ¶ 28.

Under the percentage approach, Orthogen was to receive 40% of net fees collected by Mr. Capla and Dr. Schottenstein.  Mr. Capla's reports to Orthogen reflect that the average amount of fees per patient was over $12,100.  *Id.* ¶ 29.   Using the average per-patient fee amount from Mr. Capla's reports, Orthogen was entitled to receive more than $4,840 per patient (40% of $12,100 is $4,840).  *Id.*  Assuming that 3,500 patients were treated through May 2020 (Dr. Schottenstein's complaint in the SDNY Action states the true figure is "in excess of 3,500"), and using a per-patient fee amount of $4,840, Orthogen should have received more than $16.94 million in royalty payments under the percentage approach.  Because Orthogen received only $6.3 million, under this analysis, it was defrauded out of more than **$10.64 million**.  *Id.*

Alternatively, applying the flat-fee approach — under which Orthogen was to receive a flat fee of either $4,000 or $5,000 for each initial treatment of a patient — and assuming, conservatively, that (i) each of the 3,500 patients received only one treatment, and (ii) the one treatment cost the lower $4,000 amount, Orthogen should have received at least $14 million in royalty payments.  *Id.* ¶ 30.   Because Orthogen received only $6.3 million, under this analysis, it was defrauded out of at least **$7.7 million**.  *Id.*

8

      **ii.**    ***Mr. Capla and Dr. Schottenstein's Alleged Receipt of $12 Million Per Year***

Another method of analysis supported by Dr. Schottenstein's verified complaint involves analyzing the amount distributed to Mr. Capla and Dr. Schottenstein each year as a result of the Regenokine treatments:  an average (according to Dr. Schottenstein's complaint in the SDNY Action) of $12 million.  Extrapolating that figure over the eight years in which Orthogen contracted with both Mr. Capla and Dr. Schottenstein yields a total of $96 million distributed to the two of them.  *Id.* ¶ 31.   Using the 40% of fees to which Orthogen was entitled under the 2011, 2012, and 2013 Agreements as a proxy, Orthogen was entitled to $38.4 million of the $96 million (40% of $96 million is $38.4 million).  *Id.*  Because Orthogen received only $6.3 million, under this analysis, the royalty payment shortfall is **$32.1 million**.[5]  *Id.*

    **D.**    **Orthogen Sent Demand Letters to Mr. Capla and Dr. Schottenstein**

Although the foregoing figures represent estimates that Orthogen has calculated based on incomplete information, Dr. Schottenstein's statements in the SDNY Action indicate that Orthogen was defrauded out of many millions of dollars.  *Id.* ¶ 33.  As a result, on March 10, 2023, shortly after Dr. Schottenstein made the statements, Orthogen sent demand letters to Mr. Capla and Dr. Schottenstein.  Harwood Decl. ¶ 5 & Exs. E & F.  Each letter included the facts and conclusions set forth above and demanded a response by March 17, 2023.  *Id.*

To date, Mr. Capla has not responded to his letter, which is telling.  *Id.* ¶ 6.  Dr. Schottenstein, by contrast, responded to his letter through his attorney, Jeffrey Donner, Esq.  *Id.* ¶ 7.  During a telephone call on March 22, 2023, Mr. Donner stated, in substance, that (i) the

---

[5] Alternatively, if the $96 million represents Mr. Capla's and Dr. Schottenstein's proper share of the total fees collected (*i.e.,* 60%), that would mean that a total of $160 million in fees were collected from Regenokine patients, of which $64 million (*i.e.,* 40%) should have been paid to Orthogen.  Kruger Decl. ¶ 32.   Under this analysis, the royalty payment shortfall is approximately **$57.7 million**.  *Id.*

representation in Dr. Schottenstein's complaint in the SDNY Action that he and Mr. Capla each received an average of $6 million per year is incorrect, and the correct number is $3 million (though he also suggested that the figure was less in earlier years), (ii) the representation that 3,500 patients were treated with the Regenokine program likely is correct, and certainly over 2,000 patients were treated, and (iii) Dr. Schottenstein was not involved in the preparation or submission of the reports and affidavits, was assured by Mr. Capla that the reporting to Orthogen was accurate, and is unaware of any underpayment of royalties to Orthogen.  *Id.* ¶ 8.

Even if Mr. Donner's above statements were accurate — which would mean that Dr. Schottenstein made false statements in his verified complaint — the statements confirm that Orthogen was substantially underpaid and that discovery from the Caplas relating to the underpayments is warranted.  Indeed, even if only 2,000 patients were treated (compared to the 1,325 total number of patient *treatments* reported to Orthogen), the royalty payment shortfall would still be in the millions of dollars under the above analyses.

### E.      Orthogen Seeks Discovery for the Contemplated German Proceeding

As set forth above, Dr. Schottenstein's statements in the SDNY Action constitute compelling evidence that Orthogen was defrauded out of a substantial amount of money due to Mr. Capla's apparently false reports and affidavits.  Moreover, good reason exists to believe that Dr. Schottenstein knew about and facilitated the apparent misconduct.  Beginning in 2013, the bank wires that Orthogen received in response to its invoices came from "Schottenstein Pain and Neuro" — Dr. Schottenstein's practice.  Kruger Decl. ¶ 34.  Dr. Schottenstein presumably (i) knew the amounts that *his practice* was remitting to Orthogen as payment for the fees due under the license Agreements, and (ii) recognized that the amounts could not possibly be squared with the number of patients that Dr. Schottenstein has admitted *his practice* treated.  *Id.* ¶ 35.

Accordingly, Orthogen intends to file suit in Germany (a proper forum under the license

Agreements) against Mr. Capla and Dr. Schottenstein — asserting claims of breach of contract and fraud — and Orthogen's German counsel has begun drafting the appropriate pleadings. *Id.* ¶ 36. Mr. Capla's apparent conduct in misrepresenting the number of patient treatments under the Regenokine Program and the amounts invoiced in connection with such treatments — which caused Orthogen to invoice and be paid substantially less than it was entitled to receive — fit squarely within the causes of action for breach of contract and fraud under German law. *Id.* ¶¶ 38-40. Moreover, Dr. Schottenstein's apparent knowledge and facilitation of the underreporting to Orthogen also exposes him to liability for fraud, and, at a minimum, his contractual agreement to be a joint debtor with Mr. Capla for any amounts due to Orthogen under the 2012, 2013 and 2014 Agreements exposes him to liability for breach of contract. *Id.* ¶ 41.

In order to more fully develop the facts relevant to Orthogen's claims — which at this point are based on Dr. Schottenstein's representations in the SDNY Action and the referenced statements by his attorney (during which the attorney sought to revise or qualify some of those representations, albeit in ways that still reflect that Mr. Capla's reports and affidavits were false and that Orthogen was substantially underpaid) — Orthogen seeks discovery from the Caplas through this Petition. *Id.* ¶ 42. The Caplas undoubtedly possess highly relevant evidence to the claims that Orthogen intends to assert in the Contemplated German Proceeding. *Id.* ¶ 43. Mr. Capla should possess evidence regarding, among other things, the number of Regenokine Program patient treatments provided during the relevant period (as to which he made representations in his reports and affidavits), the amounts patients paid for such treatments, the amounts he and Dr. Schottenstein received in connection with such treatments, and his reports and affidavits in connection with the treatments. *Id.* ¶ 44. With respect to Mrs. Capla, based on (i) her role working in the NY Spine laboratory in connection with the Regenokine treatments,

(ii) her role in transmitting Mr. Capla's reports and affidavits to Orthogen and (iii) the statement by Dr. Schottenstein in the SDNY Action that she received distributions in connection with the apparent misconduct (*see* SDNY Action Compl. ¶¶ 51, 64, 77), she too should possess relevant information regarding each of the above topics.  *Id.* ¶ 45.

Orthogen has narrowly crafted proposed subpoenas to be served on the Caplas to obtain the foregoing information, copies of which are annexed hereto as Exhibit B.  Orthogen intends to use the discovery (i) to refine its allegations in the Contemplated German Proceeding, (ii) as evidence in the Proceeding, and (iii) ultimately to prove its case in the Proceeding.  *Id.* ¶ 46.

Importantly, Orthogen would be unable to obtain the discovery it seeks through this Petition in the Contemplated German Proceeding.  *Id.* ¶ 47.  Under the rules governing German civil actions, Orthogen would be unable to compel the Caplas to sit for a deposition or to produce relevant documents in their possession.  *Id.* ¶ 48.  Instead, after Orthogen pleads its claims, Mr. Capla would be obligated to submit a responsive pleading.  *Id.* ¶ 49.  If he were to do so, the case would likely proceed to a hearing before the court, during which (unless Mr. Capla were voluntarily to produce evidence relevant to Orthogen's claims) Orthogen's proof would be limited to the information it has been able to develop independently (*i.e.*, Dr. Schottenstein's statements in the SDNY Action), and following which the court would render its decision.  *Id.* Because Dr. Schottenstein's statements in the SDNY Action do not conclusively establish the extent of (i) the apparent fraud or (ii) the associated underpayments to Orthogen, under this scenario, the court may not award Orthogen the full amount to which it is entitled.  *Id.*  If Mr. Capla were to decline to submit a responsive pleading (or were to submit a responsive pleading but decline to produce evidence relevant to Orthogen's claims), the court could enter judgment in Orthogen's favor, but here too, because Dr. Schottenstein's statements in the SDNY Action do

not conclusively establish the extent of the apparent misconduct or the harm to Orthogen, the court may not award Orthogen the full amount to which it is due.  *Id.* ¶¶ 50-52.  In a worst-case situation (under either of the above scenarios), the court could decline to enter a judgment for Orthogen altogether.  *Id.* ¶ 53.  The discovery sought through this Petition therefore is necessary to provide Orthogen with the information it needs to fully pursue its claims.  *Id.*

Although the discovery sought through this Petition would be unavailable to Orthogen under German law, German civil courts historically have been receptive to discovery obtained through the Section 1782 process.  *See infra* Part II.  Moreover, Orthogen's German counsel has no reason to believe that a German civil court would reject or otherwise decline to consider the evidence obtained through this Petition.  *Id.* ¶ 54.

## ARGUMENT

The Court should grant Orthogen's Section 1782 Petition because (i) it meets the statutory requirements of Section 1782, *infra* Part I, and (ii) all the factors to be weighed by the Court in exercising its discretion under Section 1782 favor granting the Petition, *infra* Part II.  Moreover, as discussed previously, *supra* n.1, the Caplas can challenge the subpoenas once they are served, and therefore will not be prejudiced by the granting of the Petition *ex parte*.

## I.    THE PETITION SATISFIES THE STATUTORY REQUIREMENTS OF SECTION 1782

To obtain discovery under Section 1782, an applicant must show that (i) the request is made "by a foreign or international tribunal" or by "any interested person"; (ii) the request seeks evidence (e.g., documents or testimony); (iii) the evidence is "for use in a proceeding in a foreign or international tribunal"; and (iv) the person from whom discovery is sought resides or is found in the district of the court ruling on the petition.  *Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031, 1034 (11th Cir. 2017); *In re Clerici*, 481 F.3d 1324, 1331 (11th Cir.

13

2007).  Orthogen's application meets each of these statutory requirements.

### A.    Orthogen is an "Interested Person" for Purposes of the Foreign Proceeding

Orthogen satisfies Section 1782's first statutory requirement because it would be the plaintiff in the Contemplated German Proceeding, and thus qualifies as an "interested person" under the statute.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782.").

### B.    The Petition Seeks Documentary and Testimonial Evidence

Orthogen satisfies the second statutory requirement, because it is seeking documentary and testimonial evidence from the Caplas.  *See, e.g., Application of Consorcio v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014) (second element satisfied where application "seeks evidence in the form of document production and deposition testimony"); *In re Alianza S.A.*, 2013 WL 6225179, at *3 (S.D. Fla. Oct. 24, 2013).

### C.    The Discovery Sought Is for Use in a Proceeding Before a Foreign Tribunal

Orthogen satisfies the third statutory requirement, because it is seeking the requested discovery for "use in a proceeding in a foreign . . . tribunal."  28 U.S.C. § 1782.  The Supreme Court has made clear that the proceeding need not be pending or even imminent; it merely needs to "be within reasonable contemplation."  *Intel*, 542 U.S. at 259.  "Although the future proceedings must be more than speculative, it suffices that the district court has sufficient indication that a proceeding in court would eventuate in which the evidence gathered can be weighed impartially."  *In re Application of Bracha.*, 663 F. App'x 755, 763 (11th Cir. 2016).

Here, this Petition provides sufficient indication that such a proceeding would eventuate.  Orthogen has retained German counsel who, through his declaration, has (i) demonstrated that Orthogen has an evidentiary basis to allege that it was defrauded by Mr. Capla and Dr.

Schottenstein, (ii) explained that the existing evidence (*i.e.*, the statements by Dr. Schottenstein in the SDNY Action) would support claims for breach of contract and fraud under German law, and (iii) established that Orthogen has begun taking steps to bring suit in Germany against Mr. Capla and Dr. Schottenstein, including drafting the necessary pleadings.  Courts routinely cite such indicia as sufficient to support Section 1782's reasonable contemplation standard.  *See, e.g., Application of Bracha*, 663 F. App'x at 764 (finding proceeding to be within reasonable contemplation because applicants "have articulated a theory upon which they intend to litigate"); *In re Gonzalez*, 2021 WL 3835180, at *5 (S.D. Fla. Apr. 14, 2021) (finding proceeding to be within reasonable contemplation because declaration from counsel provided specifics regarding civil action to be filed and causes of action to be pursued).  That Orthogen sent "a detailed demand letter" provides further support that the foreign proceeding is within reasonable contemplation.  *See In re Hansainvest*, 364 F. Supp. 3d 243, 249 (S.D.N.Y. 2018).

Moreover, Section 1782's "for use" requirement is *de minimis*.  The party seeking discovery need only show that it is able to "inject the requested information into a foreign proceeding" and that the discovery will "be employed with some advantage."  *In re Pons*, 2020 WL 364125, at *5 (S.D. Fla. Jan. 22, 2020) (citing *In re Accent Delight*, 869 F.3d 121, 132 (2d Cir. 2017)); *In re Veiga*, 746 F. Supp. 2d 8, 18 (D.D.C. 2010) (explaining that the "burden imposed" by the "for use" requirement is "de minimis").

Here, as explained above, the discovery Orthogen is seeking is directly relevant to the claims it plans to pursue in the Contemplated German Proceeding, and Orthogen intends to use the discovery to its advantage in that Proceeding:  to refine and plead its allegations against Mr. Capla and Dr. Schottenstein and ultimately to prove its case.  *See In re Clerici*, 481 F.3d at 1332-33 ("for use" requirement met where discovery would be used in foreign proceeding).

### D.     The Caplas Reside and/or are Found in this District

Orthogen satisfies the fourth statutory requirement because this Court has personal jurisdiction over the Caplas.  A court's authority to compel discovery under Section 1782 extends to any "person" who "resides or is found in" the district over which the court presides. 28 U.S.C. § 1782(a).  A person "resides or is found in" this District if this Court can exercise personal jurisdiction over him or her.  *See In re Application of Inversiones*, 2011 WL 181311, at *8 (S.D. Fla. Jan. 19, 2011) ("being 'found' . . . for purposes of personal jurisdiction" is same as being "found" for "section 1782"); *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) (same).

Here, the Caplas reside in Boca Raton, Florida, which is within this District, thus providing this Court with personal jurisdiction over them.  *See* Harwood Decl. ¶ 5.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile.").

The Petition thus satisfies all four statutory elements of Section 1782.

## II.     THE FOUR DISCRETIONARY FACTORS ALL WEIGH IN FAVOR OF GRANTING THE REQUESTED DISCOVERY

When, as here, the Section 1782 statutory requirements are met, courts also consider four discretionary factors in deciding whether to grant discovery under Section 1782:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome."

*In re Clerici*, 481 F.3d at 1331 (quoting *Intel*, 542 U.S at 264-65).  In considering these factors, courts exercise their discretion liberally in favor of granting discovery.  *See Advanced Micro*

*Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 669 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004). Moreover, the "decision to deny a § 1782 application may not be taken lightly," and Section 1782 applications are denied based on the discretionary factors only in "unusual cases." *In re WinNet*, 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017). Here, each of the discretionary factors weighs in favor of granting Orthogen's requested discovery.

**A.      Orthogen Needs Section 1782 Discovery From the Caplas**

Although the Supreme Court has noted that "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent," *Intel*, 542 U.S. at 264, "Section 1782 aid is not foreclosed just because the need for such aid may not be as readily apparent," *In re Application of Auto-Guadeloupe*, 2012 WL 4841945, at *5 (S.D.N.Y. Oct. 10, 2012), and here the need exists for Section 1782 discovery as to both Mr. Capla (an anticipated defendant in the Contemplated German Proceeding) and Mrs. Capla (who is not an anticipated defendant). *See also In re Emergency Ex Parte Application of Godfrey*, 2018 WL 1863749, at *8 (S.D. Fla. Feb. 22, 2018) ("participation in the foreign proceedings does not automatically foreclose § 1782 aid") (citation omitted).

As an initial matter, although Orthogen has good reason to believe that Mrs. Capla has information relevant to its anticipated claims (due to her role as an employee in the NY Spine lab and in transmitting Mr. Capla's reports and affidavits to Orthogen), Orthogen does not intend to name her as a party to the Contemplated German Proceeding. Consistent with that intention, Orthogen sent a demand letter to Mr. Capla, but not to Mrs. Capla. Mrs. Capla's nonparty status means that the first discretionary factor unquestionably supports granting the Petition as to her.

Moreover, even though Mr. Capla is an anticipated party to the Contemplated German Proceeding, courts routinely find that the first factor favors the applicant in such circumstances when, as here, the discovery sought pursuant to Section 1782 likely would be unavailable in the

foreign proceeding. *See In re Clerici*, 481 F.3d at 1335 (first factor favored applicant where overseas court could not require respondent to produce the requested discovery); *In re England/Bahamas*, 2021 WL 3270074, at *6 (S.D. Fla. July 30, 2021) (same where it was unclear whether "foreign tribunal could enforce a pre-suit discovery order against" respondent).[6]

As Orthogen's German counsel explained in his declaration, Orthogen would be unable to obtain the discovery it seeks through this Petition in the Contemplated German Proceeding. *See* Kruger Decl. ¶ 47-48. Orthogen's German counsel also has explained that the discovery sought through this Petition is necessary to provide Orthogen with the information it needs to fully pursue its claims . *See id.* ¶¶ 49-53. In situations such as this, where discovery in the foreign proceeding is limited such that the applicant would be unlikely to obtain the discovery sought through Section 1782 in that proceeding, courts find that the first discretionary factor favors the applicant. *See Godfrey*, 2018 WL 1863749, at *9 (citing similar disclosure limitations under English law as reason why first factor favored applicant). As particularly relevant here, courts have found that the general lack of discovery in German proceedings warrants allowing Section 1782 discovery from parties (or contemplated parties) to German proceedings. *See, e.g.*, *In re Ex Parte Application of Porsche*, 2016 WL 702327, at *7 (defendant in German litigation could use Section 1782 to obtain discovery from plaintiffs); *In re Hansainvest*, 364 F. Supp. 3d at 250 (citing "the limitations of German discovery" in granting 1782 petition).[7]

### B.    A German Court Likely Would Be Receptive to the Requested Discovery

In considering the second factor — the nature of the foreign tribunal and its receptivity to

---

[6] *See also In re Servicio*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (first factor favored applicant because of "the apparent limitations of Venezuelan discovery rules"); *In re Application of Auto-Guadeloupe*, 2012 WL 4841945, at *5 (first factor favored applicant where it was "not clear the [foreign c]ourt could order [respondent] to produce the documents that [petitioner] is seeking").

[7] Even where the first factor does not favor the applicant, Section 1782 applications still are granted where, as here, the other factors do. *See In re Application of Patokh*, 2021 WL 3270042, at *2 (S.D.N.Y. July 30, 2021).

judicial assistance from a U.S. federal court — courts require "authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782" before concluding that this factor weighs against the applicant.  *In re Deposito Centralizado*, 2021 WL 2323226, at *7 (S.D. Fla. June 1, 2021); *see Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995).

Here, as Orthogen's German counsel has confirmed, no reason exists to believe that a German court would reject the evidence obtained through this Petition.  Kruger Decl. ¶ 54.  To the contrary, German courts typically are receptive to discovery obtained through Section 1782, as evidenced by the fact that U.S. courts "routinely grant Section 1782 applications for proceedings in Germany."  *In re Hansainvest*, 364 F. Supp. 3d at 251; *see Kang v. Nova Vision, Inc.*, 2007 WL 1879158, at *2 (S.D. Fla. June 26, 2007).  This factor thus weighs in favor of granting the application.  *See In re Application of Roessner*, 2021 WL 5042861, at *3 (S.D.N.Y. Oct. 29, 2021) (second factor favored petition where, as here, German counsel stated he was "not aware of any German laws or restrictions that would preclude the use of the discovery sought").

### C.    Petitioner Is Not Seeking to Circumvent German Proof-Gathering Restrictions

The third discretionary factor "is not the same as a foreign discoverability requirement; the fact that a § 1782 application requests documents that would not be discoverable . . . in the foreign jurisdiction is not enough to render the application a 'circumvention' of foreign rules." *In re Bernal*, 2018 WL 6620085, at *7 (S.D. Fla. Dec. 18, 2018); *In re England/Bahamas*, 2021 WL 3270074, at *6 (same).  Courts weigh the third factor against the applicant only where a basis exists to find that the application was brought in bad faith.  *See In re Application of Hill*, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is 'simply unwilling to weigh the request for § 1782 assistance itself as a negative discretionary factor.'" (citation omitted)); *In re Barnwell Enterprises Ltd*, 265 F.

19

Supp. 3d 1, 12 (D.D.C. 2017) (analyzing this factor under bad faith standard).

 Here, Orthogen seeks the requested discovery in good faith for use in the Contemplated German Proceeding.  As set forth above, no reason exists to believe that a German court would reject the requested discovery, Kruger Decl. ¶ 54, and Orthogen has demonstrated that the requested discovery is highly relevant to its anticipated claims in the Contemplated German Proceeding.  Accordingly, this factor weighs in favor of granting the instant Petition.

  **D.** **Orthogen's Discovery Requests Are Narrowly Tailored and Not Unduly Intrusive or Burdensome**

 The fourth factor also weighs in favor of authorizing the requested discovery because Orthogen's discovery requests are narrowly tailored and in no way "unduly intrusive or burdensome."  *See Intel*, 542 U.S. at 265.  The subpoenas that Orthogen seeks to serve on the Caplas are narrowly tailored to obtain documents and testimony about topics that are central to its anticipated claims in the Contemplated German Proceeding:  the number of patient treatments provided under the license Agreements, the amounts paid by patients and received by Mr. Capla and Dr. Schottenstein in connection with those treatments, and the representations about the treatments that were made to Orthogen.  Thus, this factor also weighs in favor of granting the application.  *See Godfrey*, 2018 WL 1863749, at *10 (requests for documents and communications regarding relevant subject matter, and a deposition, not unduly burdensome).

 Because all four discretionary factors weigh in favor of granting the Petition, Orthogen respectfully submits that the Court should grant the Petition.

<u>**CONCLUSION**</u>

 Orthogen respectfully requests that the Court endorse the Proposed Order annexed hereto as Exhibit A, which grants Orthogen leave to serve the subpoenas annexed hereto as Exhibit B.

Dated: May 5, 2023

/s/ *Ilana Drescher*

Ilana Drescher
Fla. Bar No.: 1009124
**BILZIN SUMBERG BAENA**
**PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone: 305-374-7580
Email: idrescher@bilzin.com
Email: eservice@bilzin.com


Christopher B. Harwood (*pro hac vice* forthcoming)
Joseph Stern (*pro hac vice* forthcoming)
**MORVILLO ABRAMOWITZ GRAND IASON &**
     **ANELLO P.C.**
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com
jstern@maglaw.com

*Attorneys for Petitioner Orthogen*
*International GmbH*