**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 23-mc-80743-DMM

IN RE APPLICATION OF
ORTHOGEN INTERNATIONAL GmbH,

     Petitioner,

For an order pursuant to 28 U.S.C. § 1782
to conduct discovery for use in a foreign
proceedings.
_____/

**OBJECTIONS TO SUBPOENAS DUCES TECUM, MOTION**
**TO QUASH OR MODIFY SUBPOENAS OR IN THE ALTERNATIVE**
**MOTION TO STAY ENFORCEMENT OF SUBPOENAS**

Deponents, Edward Capla and Yolanda Capla, file these Objections to Subpoena Duces

Tecum, Motion to Quash or Modify Subpoenas or in the alternative Motion to Stay Enforcement

of Subpoenas and in support of their objections and motions show the following:

License Agreements and Compliance with Their Terms

1.     A License Agreement was entered into between Orthogen International GmbH,

Licensor, and Dr. Edward Capla, MD, Licensee, on or about May 24, 2011 to license the "know

how" and provide for royalty payments for the use of Orthogen's Regenokine Program [Doc. 4-1]

("2011 Agreement").

2.     Section 4.1 of the 2011 Agreement says in part: "The Licensee shall provide to

the Licensor within two (2) weeks after the end of each February, May, August and November a

written report in accordance with the form annexed hereto as Annex 5.1 together with an

affidavit in accordance with the confirmation form attached hereto as Annex 5.2 ...."

3.     A true and accurate example of the Annex 5.1 and Annex 5.2 as they were filled

out by the Licensee have been filed as Document 4-5 in this case.  Annex 5.1 shows the date of

any and all Regenokine Program treatments for the referenced period, the gross fee paid, the

attendant cost of the procedure and the net fee due to Orthogen for each procedure performed.

See Declaration of Edward Capla that has been filed with this motion as Exhibit 1 at paragraph 5.

4.      Section 4.4 of the 2011 Agreement states in part:  "The Licensee shall keep

separate records for the medical treatments.  The Licensor shall have the right to access and

examine during ordinary business hours any and all records of the Licensee to review the

Licensee's  compliance with the terms and conditions of this Agreement."

5.      Pursuant to this contractual provision, the Licensee kept and maintained these

separate records which were at all times available for examination and audit by Orthogen. See

Declaration of Edward Capla at paragraph 6.

6.      A Regenokine Program License Agreement was entered into between Orthogen

International GmbH, Licensor, and Douglas Schottenstein, M.D. and Edward Capla, MD,

Licensees on or about October 13, 2012 to license the "know how" and provide for royalty

payments for the use of Orthogen's Regenokine Program [Doc. 4-2] ("2012 Agreement").

Declaration of Edward Capla at paragraph 7.

7.      Section 4.1 of the 2012 Agreement states:

> The Licensees shall provide to the Licensor at the last working day
> of each month a written report in accordance with the form
> attached hereto as Annex 5.1 together with:
> (i) the original invoices in anonymised form (disclosing only the
> first three letters of the patient's surnam and the patient ID); and
> (ii) the affidavit in accordance with the confirmation form attached
> hereto as Annexes 5.2 and 5.3.

8.      A true and accurate example of the Annex 5.1 and Annex 5.3 as they were filled

out by the Licensee have been filed as Document 4-6 in this case.  Annex 5.1 shows the date of

any and all Regenokine Program treatments for the referenced period, the gross fee paid, the

attendant cost of the procedure and the net fee due to Orthogen for each procedure performed.

See Declaration Edward Capla at paragraph 8.

9.      Section 4.4 of the 2012 Agreement states in part:

> The Licensee shall keep separate records for the Regenokine
> Program.  The Licensor shall be entitled to instruct s qualified
> auditor of his choice, which may, provided all applicable data
> protection laws and regulations are being adhered to, also be an
> employee of the Licensor, to examine records of the Regenokine
> Program in order to review Licensees' compliance with the terms
> and conditions of this Agreement.  For this purpose, the auditor
> shall have the right and to access and examine during ordinary
> business hours, any and all records of the Licensees, including the
> patient data bases or accounting programs/folders  to review the
> Licensees' compliance with the terms and conditions of this
> Agreement.  The auditor shall be entitled, in accordance with the
> applicable data protection laws and regulations, to inform the
> Licensor if and to what extent the audit has revealed a shortfall in
> royalty payments that are due under this Agreement.

10.      Pursuant to this contractual provision, the Licensees kept separate medical

records and business records for patients who received Regenokine treatments under the 2012

License Agreement. See Declaration of Edward Capla at paragraph 9..

11.      On April 3, 2013, Orthogen International GmbH, Douglas Schottenstein, M.D.

and Edward Capla, M.D. entered into an Extension of License Agreement which states that the

2012 License Agreement "shall be extended untitl 31 August 2013."     See Declaration of

Edward Capla at paragraph 10

12.      Document 4-7 filed in this case is a true and accurate example of a Royalty

Report that was filled out in 2013 pursuant to the License Agreement extension.  See Declaration

of Edward Capla at paragraph 11. It shows the date of any and all Regenokine Program

treatment for the referenced period, the gross fee paid, the attendant cost of the procedure and the

net fee due to Orthogen for each procedure performed.

Case No. 23-mc-80743-DMM

13.     Separate medical records and business records were kept for patients who received Regenokine treatments under the 2013 License Agreement extension.  Those records were maintained at the medical office of Douglas Schottenstein located at 18 East 48th Street, New York, New York.  See Declaration of Edward Capla at paragraph 12.

14.     A Standard Regenokine License Agreement was entered into between Orthogen International GmbH, Licensor, and Douglas Schottenstein, M.D. and Edward Capla, MD, Licensees, on or about June 1, 2014 to license the "know how" and provide for royalty payments for the use of Orthogen's Regenokine Program [Doc. 4-4] ("2014 Agreement").  See Declaration of Edward Capla at paragraph 13.

15.     The audit rights under the 2014 License Agreement granted Orthogen the right to examine and audit all records of the Licensees in order to ensure compliance with the terms and conditions of the Agreement and it required the Licensees to keep separate records, invoices, data bases and documents for the Regenokine Program that were subject to audit.  See Declaration of Edward Capla at paragraph 13.

16.     Section 4.1 of the 2014 Agreement states:  "The Licensee #2 shall provide to the Licensor within five business days after the end of each month a written report in accordance with the Royalty Report  Form, together with the Blood Draw Log."

17.     A true and accurate example of a Royalty Report as it was filled out by the Licensee #2 has been filed as Document 4-8 in this case.  See Declaration of deponent, Edward Capla.   The Royalty Report shows the date of any and all blood draws for the Regenokine Program for the referenced period, the gross fee invoiced to the patientand the license fee due to Orthogen for each procedure performed. See Declaration of Edward Capla at paragraph 14..

19.     Separate medical records and business records were kept for patients who

received Regenokine treatments under the 2014 License Agreement.  Those records were maintained at the medical office of Douglas Schottenstein located at 18 East 48th Street, New York, New York.  See Declaration of Edward Capla at paragraph 15.

Periodic Audits Made by Orthogen During the Terms of the License Agreement

20.     Records maintained under each of the Regenokine License Agreements were periodically examined and audited by Nina Breidenbach on behalf of Orthogen pursuant to the audit rights in the License Agreements. The periodic audits lasted between two to three days. Ms. Breindenbach examined the list of Regenokine patients at the Schottenstein medical practice, the Regenokine patient records, the blood draw logs for these patients, and the financial accounting records of Dr. Schottenstein's medical practice regarding invoices and payments for the Regenokine treatments provided to those patients. Ms. Breidenbach then compared those records with the royalty reports that were sent to Orthogen pursuant to the License Agreements. During those audits, the office managers of the Schottenstein medical practice provided Ms. Breidenbach with any document she wanted and any questions she had was answered without objection. See Declaration of Edward Capla at paragraph 17.

.     21.     Never once during the terms of the 2011, 2012, 2013 or 2014 Agreements did the Licensees deny to Orthogen its rights to review the records, invoices, data bases and documentation of the Licensees related to the Regenokine program or Orthogen's rights to royalties under those Agreements.  See Declaration of Edward Capla at paragraph 18.

22.     Never once during the terms of the 2011, 2012, 2013 or 2014 Agreements did the Licensees fail to totally cooperate with the auditor sent by Orthogen. See Declaration of Edward Capla. See Declaration of Edward Capla at paragraph 19.

23.     Edward Capla and his wife were present and observed the audits made by Nina

Case No. 23-mc-80743-DMM

Breidenbach as representative of Orthogen pursuant to the 2012, 2013 and 2014 Agreements. Each time, Ms. Breidenbach, the auditor representative of Orthogen, was asked if there were any issues concerning the audits and for each she said there was "no problem" raised by any of the audits.  See Declaration of Edward Capla at paragraph 20.

Present Proceeding is a Premature and Unnecessary Use of Judicial Resources

24.     Prior to receiving the subpoena served on me during this proceeding, and continuing to date, deponent Edward Capla has not received from Orthogen, or any of its agents or lawyers, a request to examine the records, invoices, data bases and documentation of the Licensees related to the Regenokine program or Orthogen's rights to royalties pursunat to the Regenokine License Agreements described above. See Declaration of Edward Capla at paragraph 21.

25.     In or about the second week of March 2023, deponent, Edward Capla, received a letter from Morvillo Abramowitz Grand Iason & Anello dated March 10, 2023 which states at its first sentence:  "This firm has been retained by Orthogen Intenational GmbH ("Orthogen") in connection with the license aggreements that Orthogen entered into with you regarding its patented Regenokine Program."  A copy of this letter is appended to the Declaration of Edward Capla filed with this motion.  Nowhere in the letter is there a request made to Dr. Capla to allow Orthogen to examine or audit the records, invoices, data bases and documentation of the Licensees related to the Regenokine program or Orthogen's rights to royalties under the Regenokine Agreements described above. See Declaration of Edward Capla at paragraph 22.

26.     If any request had been made to deponent, Edward Capla, prior to his receiving the subpoenas in the present proceeding to allow Orthogen to review or audit the records, invoices, data bases and documentation of the Licensees related to the Regenokine program or

Orthogen's rights to royalties under the Regenokine Agreements described above, he would have cooperated fully to the best of his ability - as he did during the entire course of the effective dates of the License Agreements. See Declaration of Edward Capla at paragraph 23..

27.     The application to conduct discovery through the unique procedure of 28 U.S.C. § 1782 - to obtain documents and information which Orthogen is contractually entitled to obtain without the need for a court proceeding, for which Orthogen has always been allowed full rights of audit and inspection over the course of the License Agreements, and to which deponent, Edward Capla, has never objected - is premature and an unnecessary use of judicial resources as it was filed without first making a request to exercise the contractual audit rights under the License Agreements.

<u>No Factual Basis to Seek Records or Information Related to the 2011 Agreement</u>

28.     The Memorandum of Law in Support of Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding [Doc. 3] describes at pages 2-3 the reasons Orthogen believes it has a factual basis to conduct the discovery it seeks in the instant action and states:

> Recently, however, Orthogen has obtained evidence reflecting that it was systematically defrauded through the underreporting of patient treatments and the withholding of millions of dollars in royalty payments to which it was due.
> Orthogen learned of the fraud when, in connection with a lawsuit that Dr. Schottenstein recently filed against it and Mr. Capla (among others) in the U.S. District Court for the Southern District of New York ("SDNY Action") arising out of the termination of Dr. Schottenstein's license agreement with Orthogen, Dr. Schottenstein made sworn statements indicating that the number of Rogenokine patient treatments administered by NY Spine was far higher than Mr. Capla had reported. Specifically, in his verified complaint in the SDNY Action, Dr. Schottenstein stated that NY Spine treated thousands more patients than was reported to Orthogen and that he and Mr. Capla received millions of dollars more than would have been appropriate if the number of

Case No. 23-mc-80743-DMM

patient treatments reported to Orthogen was accurate.

Based on Dr. Schottenstein's statements in the SDNY Action, for years Mr. Capla apparently (i) prepared false reports that vastly understated both the number of Regenokine patient treatments provided by NY Spine and the dollar amounts invoiced in connection with such treatments, and (ii) falsely attested to the reports' accuracy. Moreover, although Dr. Schottenstein did not prepare the reports, good reason exists to believe that Dr. Schottenstein knew about the apparent misconduct. Beginning in 2013, the bank wires that Orthogen received in response to its invoices came from "Schottenstein Pain and Neuro" — i.e., Dr. Schottenstein's practice. Dr. Schottenstein presumably (i) knew the amounts that his practice was remitting to Orthogen as payment for the royalties due under the license agreements, and (ii) recognized that such amounts could not be squared with the number of patients that his practice treated.

Accordingly, Orthogen intends to initiate a lawsuit against Mr. Capla and Dr. Schottenstein in Germany (an indisputably proper venue for such a lawsuit under the terms of the license agreements), in which it plans to assert claims for breach of contract and fraud. To further develop the facts for purposes of the Contemplated German Proceeding, Orthogen seeks discovery through this Petition from Mr. Capla and his wife, Yolanda Capla — who worked at NY Spine and transmitted many of the reports prepared by Mr. Capla to Orthogen — that is highly relevant to its anticipated claims. The discovery seeks information related to the number of Regenokine Program patient treatments provided by NY Spine, the amounts that patients paid for such treatments, the amounts that Mr. Capla and Dr. Schottenstein received in connection with the treatments, and the reports of the treatments that Mr. Capla prepared for Orthogen.

29.     A copy of the Verified Complaint in the SDNY action, which is the sole factual basis cited by Orthogen for its application to this Court, is filed as Document 5-1 in the present case. There is not one mention in the SDNY complaint abour the 2011 License Agreement or any payments, royalties, reports or affidavits related to the 2011 License Agreement.  The "Facts Relevant to the Plaintiff's Claims" alleged in the SDNY complaint start in "mid-2012."  See paragraph 72 of the SDNY Complaint.  Taking Orthogen at its word that it intends to file complaints in Germany based on Dr. Schottenstein's statements in the SDNY action, and

considering there is no mention in the SDNY complaint concerning the 2011 Agreement or royalty payments thereunder, there is no reason or factual basis for Orthogen to seek discovery related to the 2011 Agreement or royalty payments thereunder in the present action. Yet paragraphs 6-9 of the Definitions attached to the Subpoenas make clear that Orthogen is seeking discovery from both deponents related to 2011 Agreement and the royalty payments pursuant to the 2011 Agreement.

30.     Because the documents and information sought under the Subpoenas concerning the 2011 Agreement and the royalty payments thereunder are not relevant to any potential claim that Orthogen intends to bring in the German courts, the portion of the Subpoenas related to the 2011 Agreement and the royalty payments thereunder should be quashed.

<u>Application is Based on Facts Alleged in a Complaint Which Orthogen, Itself, Says Asserts Meritless Claims</u>

31.     In its  Memorandum of Law in Support of Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding [Doc. 3], Orthogen states at page 6 that the "claims against the Orthogen parties [in the SDNY complaint] are meritless."  As can be seen from the document, itself, the overarching essence of the SDNY complaint [Doc 5-1] is a conspiracy between Orthogen and Edward Capla.  See paragraphs 29, 31, 32, 36, 40, 41, 43, 52, 98, 101, 104, 137 and 141 of the SDNY complaint among others. Paragraph 52 alleges "Capla and the other Capla defendants began to conspire with the Orthogen defendants to exclude plaintiffs from the right to practice under the Regenokine® Program License."  Paragraph 137 alleges: "Orthogen was part of the conspiracy with Capla, Wasserman and the other Capla defendants to wrongly deprive plaintiffs of the benefits of the SchottensteinRegenokine® Program License."  Count II of the Complaint is a claim for "Civil Conspiracy Against Orthogen and Capla Defendants."

32.     In the SDNY complaint, which Orthogen identifies as the sole factual basis for applying for the subpoenas issued in the present case, Orthogen and Edward Capla and Yolanda Capla are identified as co-conspirators.  In stating that the "claims against the Orthogen parties [in the SDNY complaint] are meritless" Orthogen is in effect stating that the allegations against one co-conspirator, Orthogen, in the SDNY action are meritless, but the allegations against the person with whom it conspired, Edward Capla, are an honest factual basis for seeking the discovery it seeks in the present action and for filing a lawsuit against Edward Capla in Germany.

### Fairness and Judicial Economy Will Be Promoted if the Depositions are Taken in the SDNY Action

33.     There remains an ongoing case in the U.S. District Court for the Southern District of New York, No. 22-cv-10883-PKC where Orthogen International, GmbH, Edward Capla and Yolanda Capla are parties.  A summons was issued for Orthogen in the SDNY action on May 25, 2023 and a copy is filed as Exhibit 2 to this motion.  Both Edward Capla and Yolanda Capla have been served with summonses in the SDNY action and copies of the summonses that were served on them on May 27, 2023 are appended to the Declaration of Edward Capla.

34.     The License Agreements and the dispute over royalty payments under the License Agreements are a three sided matter involving  Orthogen and its various officers and employees named in the SDNY complaint; Douglas Schottenstein and Schottenstein Pain and Neuro, PLLC d/b/a NY Spine; and Edward Capla and his various relatives who were also named in the SDNY complaint.  If the depositions of Edward Capla and Yolanda Capla are taken in the present action in the Southern District of Florida only two of the sides will be parties to the deposition as the Schottenstein entities are not parties to the present proceeding.  If the depositions of Edward Capla and Yolanda Capla are taken in the Southern District of New York action, then all three

Case No. 23-mc-80743-DMM

sides to the dispute will be able to participate.  Taking these depositions in the present Section

1782 proceeding is, in effect, an effort to take the depositions where all sides to the dispute will

be unable to attend as the Schottenstein parties will be left out of the proceeding. That is

significant as Orthogen has stated at page 3 of its Memorandum of Law in Support of Ex Parte

Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a

Foreign Proceeding [Doc. 3] that "Orthogen intends to initiate a lawsuit against Mr. Capla and

Dr. Schottenstein in Germany."  What Orthogen is trying to do in the present proceeding is to

take two day-long depositions of these witnesses outside the presence of Dr. Schottenstein and

without his ability to participate in the depositions.

35.     It will promote judicial economy and also save time and resources for the

deponents, Edward Capla and Yolanda Capla, if they were deposed only once in the SDNY

action instead of being deposed twice - regarding the same facts involving the same dispute -

once in the present case and then again in the SDNY action.

### The Events, Relevant Records and Witnesses With Knowledge Concerning this Dispute are Located in the Southern District of New York

36.     As set out in the Declaration of Edward Capla a) the overwhelming number of

Regenokine treatments at issue in this dispute were performed in New York; b) the

overwhelming number of patients receiving the Regenokine treatments were from New York; c)

the overwhelming number of patient payments were made directly from New York patients to

the Schottenstein medical office in New York; d) the patient payments were made to a payee in

New York whose bank accounts were in New York; e)  the royalty payments to Orthogen were

made by a New York payor, the Schottenstein medical office, from a bank account in New York;

f) the bank's records for the Schottenstein account from which payments were made to Orthogen

are located in New York; g) the people who are the custodians of the bank's records and who

could explain anything that needs to be explained from the bank's records concerning payments from Schottenstein medical office to Orthogen are in New York; h) the records of treatments, patient records, blood draw logs invoices to patients, payments from patients and the royalty accountings to Orthogen are located at the Schottenstein medical office in New York; i) the people who prepared the Schottenstein medical office patient and finanial records and royalty accountings to Orthogen are located in New York; j) the people who calculated, approved and effected the remittances under the License Agreements to Orthogen are located in New York; k) the contractual audits by Orthogen pursuant to the License Agreements were performed in New York; and l) the people who were present during the audits and spoke with Orthogen's chosen auditor are located in New York. See Declaration of Edward Capla at paragraph 24.

37.     Orthogen asserts at page 11 of its Memorandum of Law in Support of Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding [Doc. 3] that: "The Caplas undoubtedly possess highly relevant evidence to the claims that Orthogen intends to assert in the Contemplated German Proceeding. Id. ¶ 43. Mr. Capla should possess evidence regarding, among other things, the number of Regenokine Program patient treatments provided during the relevant period (as to which he made representations in his reports and affidavits), the amounts patients paid for such treatments, the amounts he and Dr. Schottenstein received in connection with such treatments, and his reports and affidavits in connection with the treatments. Id. ¶ 44."  This is not accurate.  As set out in the Declaration of Edward Capla: a) all patient records and financial records showing the number of Regnokine Program patient treatments were prepared, kept and maintained at the medical office of Dr. Schottenstein in New York; b) all amounts paid for those treatments were made to the medical office of Dr. Schottenstein in New York; and c) all records concerning those payments

Case No. 23-mc-80743-DMM

prepared, kept and maintained at the medical office of Dr. Schottenstein in New York.  See

Declaration of Edward Capla at paragraph 24.

> The Purposes for the Discovery Sought in This Proceeding - As Asserted by Orthogen -
> Can be Accomplished in the SDNY Action

38.     Orthogen asserts at page 12 of its Memorandum of Law in Support of Ex Parte

Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a

Foreign Proceeding [Doc. 3] that the purpose for the discovery sought in this proceeding are (i)

to refine its allegations in the Contemplated German Proceeding, (ii) as evidence in the

Proceeding, and (iii) ultimately to prove its case in the Proceeding." The same goals can be

achieved if the depositions of Edward Capla and Yolanda Capla were taken in the SDNY action

and discovery were taken from the people who actually have the documentation showing the

number of Regenokine Program patient treatments provided during the relevant periods of the

License Agreements and the amounts patients paid for such treatments.

> Orthogen Seeks to Evade Readily Available Processes in Germany for Obtaining the
> Discovery Sought in This Section 1782 Proceeding

39.     Orthogen asserts at page 12 of its Memorandum of Law in Support of Ex Parte

Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a

Foreign Proceeding [Doc. 3] that: "Under the rules governing German civil actions, Orthogen

would be unable to compel the Caplas to sit for a deposition or to produce relevant documents in

their possession."   That is not a completely accurate description of what is allowed under

German law.

40.     Filed as Exhibit 3 to this motion is the Declaration of Dr. Daniel H. Sharma.  Dr.

Sharma is an attorney licensed to practice under the laws of the Federal Republic of Germany

and has been licensed to practice law in Germany since 2000. He was admitted to the bar in

Frankfurt/Main, Germany and has been a member of that bar since 2016. He is a partner in the

law firm DLA Piper, Neue Mainzer Straße 6 - 10, 60311 Frankfurt am Main, Germany. See

Declaration of Dr. Daniel H. Sharma at paragraph 1.

    41.     Paragraph 7 of the Declaration of Dr. Daniel Sharma's states:

> As explained more fully below in this declaration, the statement at paragraph 47 of the Declaration of Stefan Kruger that "Orthogen would be unable to obtain the discovery it seeks through this Petition in the Contemplated German Proceeding" is not a complete, and thus, not a totally accurate description of German law.  As set out below with particularity, the German proceeding of Stufenklage, specified in Section 254 German Procedure Code would, in fact, allow Orthogen to obtain the documents listed in the Documents to Be Produced found at pages 7 and 8 of the Subpoenas to Testify at a Deposition in a Civil Action served on Edward Capla and Yolanda Capla if the remainder of the facts set out in the Declaration of Stefan Kruger are accurate.

    42.     Paragraph 25 of Dr. Sharma's declaration states:

> While a claiming party could simply submit a claim for the requested information and documentation it is entitled to with the intention to later start a separate proceeding for the payment claim, German procedural law provides for a faster and more pragmatic approach, which is usually applied in legal practice. To avoid separate proceedings for the disclosure and the payment request, a party will usually file an "action by stages" (*Stufenklage,* specified in section 254 German Civil Procedure Code (*Zivilprozessordnung*, "ZPO")).

    43.     Paragraphs 26 through 35 of the Declaration of Dr. Daniel H. Sharma set forth

with particularity and citations to authority in the German Civil Procedure Code how German

law does, in fact, allow a party to obtain production of each of the documents listed in the

Documents to Be Produced attached to the subpoenas served on Edward Capla and Yolanda

Capla in a Stufenklage proceeding.

    44.     The Declaration of Dr. Daniel H. Sharma also explains how, under Sections 242,

259 and 810 of the German Civil Code, Orthogen can obtain specific performance of its rights

under the Regenokine License Agreements to examine all of the documents listed in the

Documents to Be Produced attached to the subpoenas served on Edward Capla and Yolanda

Capla. Paragraph 9 of the Sharma Declaration states:

> As explained more fully below, the License Agreements described above provide to Orthogen the right pursuant to Sections 242, 259 and 810 of the German Civil Code (*Bürgerliches Gesetzbuch*, hereinafter "BGB") to examine all of the records listed in the Documents to Be Produced at pages 7 and 8 of that Subpoenas served on Edward Capla and Yolanda Capla without the need for any court proceeding upon request to examine the documents.

45.     Further, the Declaration of Dr. Daniel H. Sharma states at paragraph 11;

> With respect to this factual information, Orthogen is entitled under German law to request and receive from the Licensees under its Agreements disclosure and production of any and all records of the Licensees to review for compliance with terms and conditions of the License Agreements. A legal basis for such a right to disclosure of information against the Licensees can be established on a contractual basis as well as under statutory law.

46.     In paragraph 16 of his declaration, Dr. Sharma explains how, under Section 242

of the German Civil Code, a party can compel production of information, and documentation

where "[t]he information requested serves to assess or particularize a potential claim against the

other party (rather than against a third party only)."

47.     Paragraph 18 of the Declaration of Dr. Daniel H. Sharma states:

> According to section 259 German Civil Code, a party that is obliged to render accounts related to earnings or expenses has to provide the entitled party with accounts containing a structured compilation of earnings or expenses and, where receipts are customarily given, submit receipts. This would in any event mean that anonymized copies of the invoices to the patients should be produced.

48.     Paragraph 21 of the Declaration of Dr. Daniel H. Sharma states:

> In addition, Orthogen could, again, also rely on statutory law for its document production claim. According to section 810 BGB, a

party is entitled to inspect a document in the other party´s possession, if (i) the document was produced in the claiming party´s interests, (ii) it records a legal relationship between the claiming party and another party or (iii) records negotiations on a legal transaction involving the claiming party, provided (in all of the three options) that the applicant has a justified legal interest in the inspection of the documents.

49.     In sum, there are many ways, as explained in the Declaration of Dr. Daniel H. Sharma, how Orthogen can, in fact, obtain the information and documentation it seeks through the subpoenas served on Edward Caplan and Yolanda Capla in a German civil proceeding. The present Section 1782 proceeding is an attempt by Orthogen   to evade compliance with the procedures for obtaining that discovery in Germany as set out in the Declaration of Dr. Daniel Sharma.

Relief Sought

50.     For all of the facts, circumstances and reasons set out above, deponents, Edward Capla and Yolanda Capla seek to quash the subpoenas served on them in this proceeding.

51.     In the alternative, deponents, Edward Capla and Yolanda Capla seek an order to stay enforcement of the subpoenas served on them in this proceeding pending a resolution of the action filed in the Southern District of New York where all parties to the three sided dispute are named in the complaint and any depositions would allow for participation by all of those parties.

Date:  July 6, 2023.                                  Respectfully submitted,


                                            /s/ Joel V. Lumer_____
                                            Joel V. Lumer
                                            Fla. Bar No. 193300
                                            Attorney for Deposition Witnesses
                                            Edward Capla and Yolanda Capla
                                            7000 West Palmetto Park Road-Suite 210
                                            Boca Raton, Florida 33433
                                            Tel:  561-392-9000
                                            Email:  jlumer@lumer-law.com

Case No. 23-mc-80743-DMM

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was furnished by mail this July 6, 2023 to Ilana Drescher, Esq., of Bilzin Sumberg Baena Price & Axelrod LLP and to Christopher B. Harwood and Joseph Stern, Esq. of Morvillo Abramowitz Grand Iason & Anello P.C. by filing with the court's electronic filing service.

/s/ Joel V. Lumer_____
Joel V. Lumer